Constance R. Lindman, *pro hac vice*
Eric E. Lamb, *pro hac vice*
**SMITHAMUNDSEN LLC**
201 N. Illinois St, S Tower, Ste. 1400
Indianapolis, IN 46204
Telephone: (317) 464-4100
clindman@salawus.com
elamb@salawus.com

Anthony J. Laura, Esq.
**EPSTEIN BECKER & GREEN, P.C.**
One Gateway Center
Newark, NJ 07102
Telephone: (973) 642-1900
alaura@ebglaw.com

Attorneys for Plaintiff
RAB Lighting Inc.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| RAB LIGHTING INC., <br><br> Plaintiff, <br><br> v. <br><br> ABB LIGHTING, INC., <br> COMPACT FLUORESCENT SYSTEMS, <br> INC. d/b/a CFS, INC., GREG MURPHY, and <br> GARY BROYER, <br><br> Defendants. | Civil Action No. 3:15-cv-06066-FLW-DEA |

**PLAINTIFF RAB LIGHTING INC.'S**
**BRIEF IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.   FACTUAL BACKGROUND................................................................................. 2

   A.   RAB's Use and Registration of the RAB Marks and Trade Name.................... 2

   B.   The Defendants' Use of the ABB Marks and Trade Name ............................... 5

   C.   ABBLIGHTING Trademark Applications ......................................................... 7

   D.   The Parties' Dispute........................................................................................... 9

III.   LEGAL STANDARDS ....................................................................................... 10

   A.   Likelihood of Success on the Merits................................................................ 10

   B.   Irreparable Harm and Balance of Harms ......................................................... 13

   C.   Public Interest .................................................................................................. 14

   D.   Security ............................................................................................................ 14

IV.   RAB IS ENTITLED TO A PRELIMINARY INJUNCTION ............................. 15

   A.   RAB is Likely to Succeed on the Merits ......................................................... 15

      1. RAB Owns the RAB and RAB LIGHTING Marks, Which are Valid and Legally
         Protectable.................................................................................................... 15

      2. Confusion is likely ....................................................................................... 16

         a.   The goods directly complete................................................................. 16
         b.   The marks are strikingly similar ........................................................... 17
         c.   Other factors that may be considered.................................................... 18
            i.   Similarity between the marks.......................................................... 18
            ii.   Strength of the owner's mark.......................................................... 18
            iii.   Care and attention of purchasers.................................................... 19
            iv.   Length of time Defendants have used the mark without evidence of actual
                  confusion......................................................................................... 20
            v.   Defendants' intent.......................................................................... 20
            vi.   Actual confusion ............................................................................. 21
            vii.   Channels of trade and marketing media.......................................... 22
            viii.   Target customers............................................................................. 22
            ix.   RAB and ABB are offering the same or similar goods ..................... 22

   B.   RAB will suffer Irreparable Harm Absent an Injunction and the Balance of Harms
        Favors RAB ...................................................................................................... 23

   C.   An Injunction does not Disserve the Public Interest........................................ 25

   D.   A Modest Bond is Appropriate ........................................................................ 25

V.   CONCLUSION ................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,*
  237 F.3d 198 (3d Cir. 2000)....................................................... 11, 12, 16, 17, 18, 19

*Angel Flight of Georgia, Inc. v. Angel Flight America, Inc.,*
  522 F.3d 1200 (11th Cir. 2008) .......................................................... 14, 25

*Buying for the Home, LLC v. Humble Abode, LLC,*
  459 F. Supp. 2d 310 (D.N.J. 2006) ........................................................ 13

*Buzz Bee Toys, Inc. v. Swimways Corp.,*
  20 F. Supp. 3d 483 (D.N.J. 2014) ......................................................... 20

*Checkpoint Systems, Inc. v. Checkpoint Software Technologies,*
  269 F.3d 270, 291-92 (3d Cir. 2001) ............................................... 20, 21, 22

*E.A. Sween Co. v. Deli Exp. of Tenafly, LLC,*
  19 F. Supp. 3d 560 (D.N.J. 2014) ......................................................... 11

*E.T. Browne Drug Co. v. Cococare Products, Inc.,*
  538 F.3d 185 (3d Cir. 1998)................................................................ 11

*eBay Inc. v. MercExchange,LLC,*
  547 U.S. 388 (2006)........................................................................ 10

*Ferring Pharms., Inc. v. Watson Pharms., Inc.,*
  765 F.3d 205 (3d Cir. 2014)................................................................ 10

*Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.,*
  847 F.2d 100 (3d Cir. 1988)................................................................ 15

*Goadby v. Phila. Elec. Co.,* 639 F.2d 117 (3rd Cir. 1981) ............................. 13

*Harbortouch Payments, LLC v. Denali State Bank,*
  2015 WL 2381610 (D.N.J. May 18, 2015) ............................................... 23

*Interpace Corp. v. Lapp, Inc.,*
  721 F.2d 460 (3d Cir. 1983)........................................................ 11, 12, 17, 22

*Jews For Jesus v. Brodsky,*
  993 F. Supp. 282 (D.N.J.) *aff'd,* 159 F.3d 1351 (3d Cir. 1998)........................ 14, 24

*Kos Pharm., Inc. v. Andrx Corp.,*
  369 F.3d 700 (3d Cir. 2004)....................................................... 13, 17, 21, 22, 24

*Louis Rich, Inc. v. Horrace W. Longacre, Inc.*,
   423 F. Supp. 1327 (E.D. Pa. 1976) ................................................................. 11

*Morningside Grp. Ltd. v. Morningside Capital Grp.*, L.L.C.,
   182 F.3d 133 (2d Cir. 1999) ............................................................... 20, 23

*Opticians Ass'n of Am. v. Indep. Opticians of Am.*,
   920 F.2d 187 (3d Cir. 1990) .............................................. 13, 14, 24, 25

*S & R Corp. v. Jiffy Lube Intern., Inc.*,
   968 F.2d 371 (3d Cir. 1992) ............................................................. 14, 24

*Sabinsa Corp. v. Creative Compounds, LLC*,
   609 F.3d 175 (3d Cir. 2010) ............................................................. 17, 22

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
   505 U.S. 763 (1992) ......................................................................... 18, 19

*Versa Prods. Co. v. Bifold Co. (Mfg.)*,
   50 F.3d 189 (3d Cir.1995) .......................................................................... 19

*Winter v. Natural Resources Defense Council, Inc.*,
   555 U.S. 7 (2008) ........................................................................................ 10

**Statutes**

Lanham Act § 7(b), 15 U.S.C. § 1057(b) ........................................... 11, 15

Lanham Act § 15, 15 U.S.C. § 1065 ........................................... 3, 11, 15

Lanham Act § 32, 15 U.S.C. § 1114 ................................................. 10, 11

Lanham Act § 33(a), 15 U.S.C. § 1115(a) ....................................... 11, 15

Lanham Act § 33(b), 15 U.S.C. § 1115(b) ............................................. 15

Lanham Act § 43(a), 15 U.S.C. § 1125 .................................................. 11

**Rules**

Federal Rule of Civil Procedure 65(c) ..................................................... 14

I.   INTRODUCTION

Plaintiff RAB is headquartered in New Jersey and has been in business since 1946. RAB has sold lighting fixtures across the United States for over a decade under the following mark:



Defendants ABB and CFS are both headquartered in New Jersey. Murphy is President of ABB and Broyer is President of CFS and Vice President of ABB. In contrast to RAB's long use, the Defendants began selling lighting fixtures under the following mark in the United States no earlier than March of this year:

RAB and Defendants sell directly competing goods using their respective marks. Some examples of RAB's LED lighting fixtures and ABB's competing LED lighting fixtures are shown below.

| RAB | ABB | RAB | ABB |
|-----|-----|-----|-----|
|     |     |     |     |

The Defendant's unauthorized use of the mark ABB LIGHTING is likely to cause confusion in violation of the Lanham Trademark Act and New Jersey common law. Defendants should be preliminarily enjoined from using the mark ABB LIGHTING, the trade name ABB Lighting, and any other confusingly similar mark or name, in order to protect the valuable and long-standing goodwill established by RAB in its trademarks and trade name and to protect the public from confusion.

II.    <u>FACTUAL BACKGROUND</u>

    A.    <u>RAB's Use and Registration of the RAB Marks and Trade Name</u>

RAB adopted and began using the trademark and trade name RAB in connection with lighting fixtures and related goods at least as early as 1948 and has used the RAB mark and trade name continuously since then. (Declaration of Ross Barna ("Barna Decl.") ¶ 5) RAB owns numerous United States trademark registrations for word and design marks incorporating "RAB" in connection with lighting fixtures and related goods. A partial list is included below and the complete list (the "RAB Registered Marks") with copies of the registrations (the "RAB Registrations") is provided in the Declaration of Constance Lindman ("Lindman Decl.") ¶¶ 4-5, Exs. 1-2.

| Mark | Registration No. | Registration Date | First Use Date | Goods |
|------|------------------|-------------------|----------------|-------|
| RAB | 1,828,207 | 1994 | 1948 | Electrical equipment; namely, indoor and outdoor motion-activated lighting fixtures with explosionproof, vaporproof, weatherproof and vandalproof features. |
| RAB | 3,160,726 | 2006 | 1948 | Electric lighting fixtures and parts thereof; electrical equipment-namely, junction boxes, outlet boxes, cover plates and plugs for lighting fixtures. |

| Mark | Registration No. | Registration Date | First Use Date | Goods |
|---|---|---|---|---|
| RAB LIGHTING | 3,442,298 | 2008 | 2004 | Electric lighting fixtures and parts thereof; electrical equipment, namely, indoor and outdoor motion-activated lighting fixtures with explosion-proof, vapor-proof, weatherproof and vandal-proof features; electrical equipment-namely, junction boxes, electric outlet junction boxes, electrical outlet cover plates, plugs for lighting fixtures. |
| **RAB** | 3,476,075 | 2008 | 1950 | Electric lighting fixtures and parts thereof; electrical equipment, namely, indoor and outdoor motion-activated lighting fixtures with explosion-proof, vapor-proof, weatherproof and vandal-proof features; electrical equipment-namely, junction boxes, electric outlet junction boxes, electrical outlet cover plates, plugs for lighting fixtures. |

RAB filed a Declaration of Incontestability with the United States Patent and Trademark Office ("USPTO") for each of the RAB Registered Marks, and the USPTO acknowledged that the declarations meet the requirements of Lanham Act § 15, 15 U.S.C. § 1065. (Lindman Decl. ¶ 6, Ex. 3) RAB sells its lighting fixtures and related goods bearing the RAB Registered Marks across the United States. (Barna Decl. ¶ 6)

RAB adopted and began using the RAB design mark in a distinctive red font as shown below (the "RAB Color Mark") in connection with lighting fixtures in the 1970s or 1980s. (Barna Decl. ¶ 7) RAB adopted and began using the RAB Color Mark with the word "lighting" in black font as shown below (the "RAB Lighting Color Mark") in connection with lighting fixtures at least as early as 2014. (Barna Decl. ¶ 8)





3

RAB uses the RAB Color Mark and the RAB Lighting Color Mark (collectively, the "RAB Color Marks") in connection with lighting products throughout the United States. (Barna Decl. ¶ 9) The RAB Registered Marks and the RAB Color Marks are referred to collectively as the "RAB Marks."

RAB sells a wide variety of lighting products for use in commercial and residential environments under the RAB Marks, including LED lighting fixtures, indoor lighting fixtures, outdoor lighting fixtures, sensors, poles and accessories. (Barna Decl. ¶ 10, Ex. 1) The suggested retail price for RAB's LED lighting fixtures ranges from $30 to $1,500 each. (Barna Decl. ¶ 11)

RAB's products are sold by over 5,000 electrical distributors and contractors across the United States. (Barna Decl. ¶ 12) RAB markets its products on its web site and catalog and through sales representatives. (Barna Decl. ¶ 13) RAB has appeared in ledsmagazine.com, a popular trade magazine and website in the lighting industry. (Barna Decl. ¶ 14) RAB exhibits regularly at the LIGHTFAIR International trade show ("LIGHTFAIR"), including the most recent show that took place May 5-7 at the Javits Center in New York City. (Barna Decl. ¶ 15) LIGHTFAIR bills itself as the world's largest annual architectural and commercial lighting trade show and conference. (Lindman Decl. ¶ 7, Ex. 4)

RAB has experienced success in the LED light fixture market, selling more than one-million such fixtures since introducing its first LED light fixture in October 2009.[1] (Barna Decl. ¶ 16) RAB is widely recognized among electrical distributors and contractors as a leading manufacturer and distributor of LED Lighting and the RAB Marks well known in its industry. (Barna Decl. ¶ 17)

---

[1] As a privately-held company, RAB's sales and revenue figures are confidential. RAB will provide such information to the Court *in camera* at the Court's request or subject to an acceptable protective order.

RAB is a privately held company in its fourth generation of family ownership with a rich history. (Barna Decl. ¶ 4) RAB has pioneered significant advances in lighting. For example, in the 1940s, RAB introduced the first floodlight with enclosed wiring in the 1940s, the first polycarbonate outdoor lighting enclosure in the 1950s, and the first infrared motion sensor light control in the 1980s. (Barna Decl. ¶ 18)

RAB products have also been used in prominent projects. For example, RAB lighting fixtures illuminated Michelangelo's *Pieta* at the 1964 World's Fair in New York, NASA's Space Shuttle Launch Tower in 1989, and the Olympic Rings at the 2002 Winter Olympics in Salt Lake City, Utah. RAB provided lighting fixtures on an emergency basis for 2001 World Trade Center recovery efforts and RAB lighting fixtures illuminated the 2011 World Trade Center rebuilding as the Freedom Tower. (Barna Decl. ¶ 19)

B.     The Defendants' Use of the ABB Marks and Trade Name

ABB was incorporated in Delaware on March 27, 2015 and has a principal place of business located at 3 Adams St., Belvidere, NJ 07823. (Lindman Decl. ¶¶ 8-9, Exs. 5-6) Murphy is President of ABB. (Lindman Decl. ¶ 10, Ex. 8-9) ABB adopted and is using the below trademark in connection with LED lighting fixtures (the "ABB Mark") (Lindman Decl. ¶¶ 9 and 11, Exs. 6 and 10):



CFS is a New Jersey corporation, incorporated in 1998, with its principal place of business at the same address as ABB, namely 3 Adams St., Belvidere, NJ 07823. (Lindman Decl. ¶ 12, Ex. 11) ABB and CFS are closely related. In addition to sharing the same address for their principal places of business, ABB and CFS also share a phone number. ABB's product sheets list

5

ABB's phone number as (908) 475-8991, the same telephone number CFS lists on its website cfsinc.us. (Lindman Decl. ¶¶ 11 and 13, Exs. 10 and 12) The CFS website www.cfsinc.us displays the ABB Mark and describes ABB products as "CFS Inc.'s Newest Line of LED Lighting." (Lindman Decl. ¶ 13, Ex. 12)

Murphy and Broyer are also closely related. Broyer is President of CFS and Vice President of Engineering for ABB (Lindman Decl. ¶ 14-15, Ex. 13-14) Records for the cfsinc.us domain name registrar, ENOM, Inc., list Murphy as the Registrant Name, Administrative Contact Name, Billing Contact Name, and Technical Contact Name for the cfsinc.us domain name. (Lindman Decl. ¶ 16, Ex. 15) Murphy presented at the New Jersey Illuminating Engineering Society 2013-2014 Kickoff Meeting on behalf of CFS. (Lindman Decl. ¶ 17, Ex. 16) In 1991, Murphy and Broyer filed a patent application as co-inventors for an adapter for fluorescent lamps. (Lindman Decl. ¶ 18, Ex. 17)

Both Murphy and Broyer have worked in the lighting industry for decades. Murphy has worked in the lighting industry for over thirty years and, before becoming President of ABB, worked at MaxLite, a New Jersey manufacturer of LED lighting fixtures, for over 20 years. (Lindman ¶ 19, Ex. 18) Broyer has worked in the lighting industry since at least 1998. (Lindman ¶ 20, Ex. 19) Additionally, as noted above, Murphy and Broyer filed a patent application as co-inventors for an adapter for fluorescent lamps in 1991. (Lindman Decl. ¶ 18, Ex. 17)

ABB, under the direction of Murphy and Broyer, only recently entered the United States lighting industry. ABB issued a press release dated March 4, 2015 announcing "ABB Lighting enters North American market to offer stock and custom commercial LED luminaires"[2] and stating that "ABB Lighting's first industry appearance will be at LightFair International, in early

---

[2] A "luminaire" is a "lighting fixture." See https://en.wikipedia.org/wiki/Light_fixture

May….” (Lindman Decl. ¶ 21, Ex. 20) Murphy's LinkedIN page and ABB's FaceBook page each refer to ABB as "a start-up manufacturer of customizable, LED luminaires in the United States and Canada." (Lindman Decl. ¶ 10, Exs. 8-9) Murphy's LinkedIN page indicates that he joined ABB Lighting in March 2015 and that Murphy is ABB's first President." (Lindman Decl. ¶ 10, Ex. 8)

Indeed, ABB exhibited at the 2015 LIGHTFAIR trade show and displayed the ABB Mark in its booth as shown in the photograph below. (Declaration of Terri Dumas ("Dumas Decl.") ¶ 4; Barna Decl. ¶ 20)



During the 2015 LIGHTFAIR tradeshow, RAB's Vice President of Strategic Accounts, Terri Dumas, was approached by the president of one of RAB's largest customers. The customer said that he had seen ABB's booth earlier in the day and asked Dumas if there was any relationship between ABB and RAB. [3] (Declaration of Terri Dumas ("Dumas Decl.") ¶ 5)

C.     ABBLIGHTING Trademark Applications

On May 4, 2015, ABB filed United States Trademark Application Serial No. 86/618,126 for the mark ABBLIGHTING in standard character form (the "'126 Application"). In the '126

---

[3] The identity of RAB's customers is also confidential. RAB will identify the confused customer to the Court *in camera* upon request or subject to an acceptable protective order.

Application, ABB sought registration of the mark ABBLIGHTING in standard characters for

each of the following goods:

> Aquarium lights; Ceiling lights; Chandeliers; Diving lights; Electric lamps; Electric light bulbs; Electric lights for Christmas trees; Electric torches for lighting; Germicidal lamps for purifying air; Globes for lamps; High intensity search lights; Lamp casings; Lamp glasses; Lamp reflectors; Lamp shades; Lamps; Lampshade holders; LED (light emitting diode) lighting fixtures; Light bulbs; Light diffusers; Lighted party-themed decorations, electric light decorative strings; Lighting apparatus, namely, lighting installations; Lighting tubes; Luminous house numbers; Pocket search lights; Safety lamps for underground use; Searchlights; Sockets for electric lights; Ultraviolet ray lamps, not for medical purposes; street lamps

The '126 Application stated that ABB "is using the mark in commerce on or in connection with

the goods/services in the application," and that the mark "was first used in commerce at least as

early as 11/18/2013." (Lindman Decl. ¶ 22, Ex. 20)

After RAB advised ABB that the '126 Application was not entitled to registration

because ABB was not, in fact, using the ABBLIGHTING mark in the United States in interstate

commerce on or in connection with all of the goods identified in the '126 Application on the date

the '126 Application was filed and that these misstatements constituted fraud on the USPTO,

Murphy, on behalf of ABB, expressly abandoned the '126 Application. (Lindman Decl. ¶¶ 23

and 27, Exs. 22 and 27)

On July 2, 2015, ABB filed United States Trademark Application Serial No. 86/682,730

for the mark ABBLIGHTING in standard character form (the "'730 Application"). The '730

Application was signed on behalf of ABB by Murphy using the title "director." In the '730

Application, ABB seeks registration of the mark ABBLIGHTING in standard characters for the

following goods: "electric lighting fixtures; LED (light emitting diode) lighting fixtures; lighting

fixtures." The '730 Application states that ABB "is using the mark in commerce on or in

connection with the goods/services in the application" and that the mark "was first used in

commerce at least as early as 3/28/2015." (Lindman Decl. ¶ 24, Ex. 23) The USPTO has not yet assigned the '730 Application to a trademark examiner and the application remains pending. (Lindman Decl. ¶ 24, Ex. 24)

    D.  <u>The Parties' Dispute</u>

When RAB became aware of ABB's use of the ABB Mark at LIGHTFAIR in May 2015, RAB's counsel, Constance Lindman, advised ABB by letter dated May 8, 2015 that RAB owned the RAB Marks and demanded that ABB cease its infringing use of the ABB Mark. (Lindman Decl. ¶ 25, Ex. 25)

In his May 26, 2015 response, counsel for ABB, Kevin K. Tung, acknowledged that "ABB Lighting and RAB are in the similar commercial lighting business," but argued that "the high-end commercial lighting products offered by ABB Lighting are distinguishable from the product lines of RAB." ABB also denied similarity of the marks and characterized the RAB marks as weak. (Lindman Decl. ¶ 26, Ex. 26)

In reply, by letter dated June 11, 2015, Ms. Lindman disagreed with Mr. Tung's assertion that RAB's products were not considered "high-end," but noted that even if this were true, the difference would be insufficient to obviate likelihood of confusion. Ms. Lindman further noted that the differences between the marks are minor. "Both marks consist of three letters followed by the word 'lighting.' Two out of the three letters appear in both marks. Moreover, ABB deliberately chose to exactly duplicate RAB's distinctive font and red color." Finally, Ms. Lindman argued that actual confusion is not a prerequisite for trademark infringement, while still providing evidence that such confusion had indeed occurred. (Lindman Decl. ¶ 27, Ex. 27) In her June 11 letter, Ms. Lindman also asserted that ABB, CFS, Broyer and Murphy were acting together in concert and participation to willfully infringe RAB's rights. Accordingly, a copy of

Ms. Lindman's June 11, 2015 letter was sent to CFS, addressed to the attention of Broyer. (Lindman Decl. ¶ 28, Ex. 28)

Further attempts were made to resolve the dispute without avail. (Lindman Decl. ¶ 29) The Defendants have continued to use the ABB Mark, necessitating the commencement of this action for trademark infringement and this motion for preliminary injunction. There has already been at least one incident of confusion arising from use of the ABB Mark. If Defendants are allowed to continue using the mark, there is an immediate danger of further confusion. RAB will lose sales and will suffer harm to the valuable goodwill that it has built up over many decades, especially if the ABB Lighting products or services are inferior to RAB products. (Barna Decl. ¶ 21)

## III.   **LEGAL STANDARDS**

The decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts and is exercised consistent with traditional principles of equity. *eBay Inc. v. MercExchange,LLC,* 547 U.S. 388, 394 (2006). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014), quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

### A.   **Likelihood of Success on the Merits**

To prevail on a claim for trademark infringement under § 32 of the Lanham Act, a plaintiff must demonstrate: (1) the plaintiff's mark is valid and legally protectable, (2) plaintiff owns the mark, and (3) the defendant's unauthorized use of the mark is likely to create confusion

concerning the origin of goods or services. Lanham Act § 32, 15 U.S.C. § 1114; *E.T. Browne Drug Co. v. Cococare Products, Inc.,* 538 F.3d 185, 191 (3rd Cir. 1998). Similarly, under § 43(a) of the Lanham Act, a plaintiff can demonstrate injury if the defendant's unauthorized use of a mark is likely to create confusion concerning the origin of the goods or services. Lanham Act § 43(a), 15 U.S.C. § 1125; *Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc.,* 143 F.3d 800, 803 (3d Cir. 1998).

A United States Trademark Registration is *prima facie* evidence that the registered mark is valid and that the owner of the registration is entitled to exclusive use of the mark in commerce in connection with the goods or services identified in the registration. Lanham Act §§ 7(b) and 33(a), 15 U.S.C. §§ 1057(b) and 1115(a); *E.A. Sween Co. v. Deli Exp. of Tenafly, LLC,* 19 F. Supp. 3d 560, 568 (D.N.J. 2014); *Louis Rich, Inc. v. Horrace W. Longacre, Inc.,* 423 F. Supp. 1327, 1336 (E.D. Pa. 1976). The right to use a registered mark in United States commerce in connection with the registered goods becomes incontestable if the mark has been in continuous use for five consecutive years after registration and an affidavit of incontestability is timely filed. Lanham Act § 15, 15 U.S.C. § 1065.

Likelihood of confusion exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark. *Pappan,* 143 F.3d at 804. When the goods involved in a trademark infringement action directly compete with one another, a court need rarely look beyond the mark itself to determine the likelihood of confusion. *Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460, 462 (3d Cir. 1983); *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 211 (3d Cir. 2000). In such event, the court will generally examine the registered mark, determine whether it is inherently distinctive or has acquired sufficient

11

secondary meaning to make it distinctive, and compare it against the challenged mark. *Lapp,* 721 F.2d at 462. "If products are directly competing, and the marks are clearly very similar, a district judge should feel free to consider only the similarity of the marks themselves." *A & H Sportswear,* 237 F.3d at 213.

While a district court may look only at the marks themselves where the goods compete, the court may *choose* to look beyond the similarity of the marks in determining likelihood of confusion. *A & H Sportswear,* 237 F.3d at 211. In this case, the following factors are considered:

    (1)    the degree of similarity between the owner's mark and the alleged infringing mark;

    (2)    the strength of the owner's mark;

    (3)    the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

    (4)    the length of time the defendant has used the mark without evidence of actual confusion arising;

    (5)    the intent of the defendant in adopting the mark;

    (6)    the evidence of actual confusion;

    (7)    whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;

    (8)    the extent to which the targets of the parties' sales efforts are the same;

    (9)    the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;

    (10)    other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

*Id.* at 213.

Not all factors will be relevant in all cases; further, the different factors may properly be accorded different weights depending on the particular factual setting. A district court should utilize the factors that seem appropriate to a given situation. *Id.*

The elements of a claim of unfair competition under the Lanham Act are the same as for claims of unfair competition and trademark infringement under New Jersey statutory and common law. *Buying for the Home, LLC v. Humble Abode, LLC,* 459 F. Supp. 2d 310, 317 (D.N.J. 2006).

B.    **Irreparable Harm and Balance of Harms**

Grounds for a finding of irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill. *Pappan,* 143 F.3d at 805. The possibility of confusion may also cause irreparable injury. *Id.* Irreparable harm exists when the injury is "of a peculiar nature, so that compensation in money damages cannot atone for it." *Goadby v. Phila. Elec. Co.,* 639 F.2d 117, 121 (3d Cir. 1981). Moreover, when damages are difficult to ascertain or are inadequate, the plaintiff will succeed in a showing of irreparable harm. *Id.*

After determining whether the claimant will suffer irreparable harm, the court next weighs the harm sustained by the claimant if injunctive relief is not granted against the harm sustained by the infringer if injunctive relief is granted. *Pappan,* 143 F.3d at 805. "(T)he district court must consider...the extent to which the defendants will suffer irreparable harm if the preliminary injunction is issued." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990). "District courts should consider financial damages when establishing and setting the bond for an injunction (against an alleged infringer), not when deciding whether to grant it." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 728 (3d Cir. 2004). The costs in time

13

and money associated with adopting a new mark are "injuries ... that could [] be remedied by money damages." *Id.*, citing *Pappan*, 143 F.3d at 805-806.

The Third Circuit has consistently found that when an infringer's harm is "self-inflicted," the balancing of hardships will weigh in favor of the plaintiff. *Pappan,* 143 F.3d at 806; *see also S & R Corp. v. Jiffy Lube Intern., Inc.,* 968 F.2d 371, 379 (3d Cir. 1992); *Opticians,* 920 F.2d at 197. "The Defendant cannot complain he will suffer irreparable injury if a preliminary injunction is issued because he misappropriated the Mark and the Name of the Plaintiff Organization with full knowledge of the rights of the Plaintiff." *Jews For Jesus v. Brodsky*, 993 F. Supp. 282, 312 (D.N.J.) *aff'd,* 159 F.3d 1351 (3d Cir. 1998).

C.   **Public Interest**

Finally, the court must consider whether granting injunctive relief will disserve the public interest. *Pappan,* 143 F.3d at 807. In a trademark case, "public interest" is "most often a synonym for the right of the public not to be deceived or confused." *Id.* (quoting *Opticians,* 920 F.2d at 197). "Where a likelihood of confusion arises out of the concurrent use of a trademark, the infringer's use damages the public interest." *Jiffy Lube,* 968 F.2d at 379. Thus, protection of the public is essentially assumed once likelihood of confusion is found. *See Angel Flight of Georgia, Inc. v. Angel Flight America, Inc.*, 522 F.3d 1200, 1209 (11th Cir. 2008) (injunctions are "the order of the day" in trademark infringement actions).

D.   **Security**

Federal Rule of Civil Procedure 65(c) provides for the posting of security by a preliminary injunction movant "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The

Court has discretion over the amount of the security. *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988).

**IV.** **RAB IS ENTITLED TO A PRELIMINARY INJUNCTION**

  A. **RAB is Likely to Succeed on the Merits**

RAB has a protectable right in the RAB marks and the Defendants' use of the ABB Mark is likely to cause confusion.

  1. RAB Owns the RAB and RAB LIGHTING Marks, Which are Valid and Legally Protectable

RAB has used the RAB mark and the RAB trade name for nearly 70 years and sells its lighting products across the United States. (Barna Decl. ¶ 5) RAB has established strong common law rights in the RAB Marks and the RAB trade name. (Barna Decl. ¶ 17) RAB has also obtained numerous federal registrations for the RAB and RAB LIGHTING marks. (Lindman Decl. ¶¶ 4-5, Exs. 1-2) The RAB Registrations are *prima facie* evidence of the validity of the RAB Registered Marks, of RAB's ownership of these marks, and of RAB's exclusive right to use the marks in commerce throughout the United States in connection with the services identified in the RAB Registrations, including "lighting fixtures." Lanham Act §§ 7(b) and 33(a). Each of the RAB Registrations is incontestable under Lanham Act § 15, 15 U.S.C. § 1065, as to all listed goods and, therefore, is conclusive evidence of RAB's exclusive right to use the RAB Registered Marks in commerce on or in connection with such goods pursuant to Lanham Act § 33(b), 15 U.S.C. § 1115(b). (Lindman Decl. ¶ 6, Ex. 3)

Among others, RAB owns an incontestable registration for the below mark (the "RAB Design Mark") without claim to any specific color for lighting fixtures and other goods.



RAB has used the RAB Color Mark (consisting of the RAB Design Mark in a distinctive red color) for approximately thirty or forty years. (Barna Decl. ¶ 7) RAB has used the RAB Lighting Color Mark (consisting of the RAB Color Mark with the word "lighting" in black below) for over a decade. (Barna Decl. ¶ 8) RAB uses these marks in connection with lighting products throughout the United States. (Barna Decl. ¶ 9)

   

RAB owns each of the RAB Marks in connection with lighting fixtures and other goods, and each of these marks is valid and legally protectable.

### 2.    Confusion is likely

Defendants' use of the ABB Mark is likely to create confusion concerning the origin of the goods. The Third Circuit recognizes that a court need rarely look beyond the mark itself to determine likelihood of confusion when the goods involved in a trademark infringement action directly compete with one another. *Interpace*, 721 F.2d at 462, *A & H*, 237 F.3d at 211.

### a.    The goods directly complete

RAB's goods and ABB's goods directly compete with one another. Murphy declared on behalf of ABB in the pending '730 Application that the ABB Mark is being used in connection with "electric lighting fixtures; LED (light emitting diode) lighting fixtures; lighting fixtures." (Lindman Decl. ¶ 24, Ex. 24) Similarly, RAB owns incontestable federal registrations for the marks RAB and RAB LIGHTING in standard characters and for the RAB Design Mark for lighting fixtures. Counsel for ABB, Kevin K. Tung, conceded in his May 26, 2015 letter that "ABB Lighting and RAB are in the similar commercial lighting business." (Lindman Decl. ¶ 26, Ex. 26)

16

An examination of the goods shown in ABB's website further shows that the parties not only each sell LED lighting fixtures under their respective marks, but the LED lighting fixtures themselves are remarkably similar. Some examples of RAB LED lighting fixtures and ABB LED lighting fixtures from their respective websites are shown in the Introduction on page 1 above. Lindman Declaration ¶ 9, Ex. 7 contains these and other examples.

> b.    *The marks are strikingly similar*

Having established that the goods compete, the Court need only compare the ABB Mark to the RAB Marks to determine likelihood of confusion. *Lapp,* 721 F.2d at 462. As shown below, the comparison of the marks is as obvious as the comparison of the goods.

"The single most important factor in determining likelihood of confusion is mark similarity." *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 183 (3d Cir. 2010). The proper test is not a side-by-side comparison but, rather, "whether the labels create the same overall impression when viewed separately." *Id.*, quoting *Kos*, 369 F.3d at 713. Overall impression is created by the sight, sound, and meaning of the mark. See *A & H Sportswear v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 217. RAB and ABB each comprise three letters. RAB and ABB share two of the three letters in common. The only differing letter, the R in RAB, is visually similar to the duplicate letter B in ABB. Adding the common word "lighting" to each mark – to form RAB LIGHTING and ABB LIGHTING – only increases the similarity. The ABB Mark even uses the same font and same red and black colors as the RAB Color Marks. Indeed, the font and red color is so close, it appears that Defendants merely removed the R from RAB and added a duplicate B.

  

In addition to the striking visual similarity, the marks sound nearly identical regardless of whether each letter is pronounced individually (R-A-B and A-B-B) or as a single syllable ("rab" and "ab"). RAB and ABB each comprise initials and have no meaning in and of themselves. The identical "lighting" element of the marks has, of course, the identical meaning.

In sum, the RAB Marks are valid and legally protectable. ABB's goods directly compete with RAB's goods. Indeed, the parties' goods are remarkably similar. The ABB Mark is so similar to the RAB Marks in sight, sound and meaning that confusion is likely. It is highly likely that RAB will succeed on the merits when this action ultimately goes to trial.

*c.*     *Other factors that may be considered*

While the Court need not look beyond the allegedly infringing mark itself where the goods compete, it may choose to consider additional factors. *A & H Sportswear,* 237 F.3d at 213. Each of the additional factors indicates that confusion is likely or is neutral.

*i.*     *Similarity between the marks*

As discussed above, the marks are highly similar and this factor strongly indicates likelihood of confusion.

*ii.*     *Strength of the owner's mark*

The strength of a mark is measured by "(1) the distinctiveness or conceptual strength of the mark; and (2) the commercial strength or marketplace recognition of the mark." *A & H Sportswear*, 237 F.3d at 221. The initial strength of a mark depends on where it falls on the spectrum of categories of generally increasing distinctiveness (generic–descriptive–suggestive–arbitrary–fanciful) and its standing in the marketplace. *Id.* at 221-222. *See also Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).

Arbitrary or fanciful marks neither describe nor suggest anything about the product; they "bear no logical or suggestive relation to the actual characteristics of the goods." *A & H Sportswear*, 237 F.3d at 221 (citation omitted). Arbitrary and fanciful marks are inherently distinctive. *Two Pesos,* 505 U.S. at 768. Prior to RAB's adoption of the RAB mark, the term was not associated with lighting products. Therefore, "RAB" is arbitrary or fanciful and inherently distinctive.

RAB has used the RAB mark and the RAB trade name for nearly 70 years. (Barna Decl. ¶ 5)   RAB has a rich history in the lighting industry. Among other achievements, RAB introduced the first floodlight with enclosed wiring in the 1940's, the first polycarbonate outdoor lighting enclosure in the 1950s, and the first infrared motion sensor light control in the 1980s. (Barna Decl. ¶ 18)   RAB products have been used in prominent projects, including to illuminate Michelangelo's "Pieta" at the 1964 World's Fair, NASA's 1989 Space Shuttle Launch Tower, and the Olympic Rings at the 2002 Winter Olympics. RAB provided lighting fixtures on an emergency basis for 2001 World Trade Center recovery efforts and RAB lighting fixtures illuminated the 2011 World Trade Center rebuilding as the Freedom Tower. (Barna Decl. ¶ 19) RAB has sold more than one-million LED lighting fixtures since introducing its first LED lighting fixture in October 2009.[4] (Barna Decl. ¶ 16)   The significant strength of the RAB mark weighs heavily in favor of confusion.

### iii.        *Care and attention of purchasers*

"A low price increases the likelihood of confusion because consumers take less care in purchasing inexpensive goods." *See Versa Prods. Co. v. Bifold Co. (Mfg.)*, 50 F.3d 189, 204 (3d

---

[4] As a privately-held company, RAB's sales and revenue figures are confidential. RAB will provide such information to the Court *in camera* at the Court's request or subject to an acceptable protective order.

Cir.1995). The party's respective LED lighting fixtures are, admittedly, not low-priced "impulse" goods. On the other hand, at a retail price range of $30 to $1,500 each, neither are they exceptionally high-priced goods. (Barna Decl. ¶ 11) Moreover, when "there is a high degree of similarity between the parties' services and marks, the sophistication of the buyers cannot be relied on to prevent confusion." *Morningside Grp. Ltd. v. Morningside Capital Grp., L.L.C.*, 182 F.3d 133, 143 (2d Cir. 1999). Therefore, this factor is neutral.

*iv.      Length of time Defendants have used the mark without
evidence of actual confusion*

Defendants began using the ABB Mark in the United States no earlier than March of this year, less than 6 months ago. (Lindman Decl. ¶ 24, Ex. 24) Just two months later, at the May 2015 LIGHTFAIR, the mark caused actual confusion. (Dumas Decl. ¶ 5) Concurrent sales for an appreciable period of time *without* evidence of actual confusion may indicate that continued marketing is not likely to lead to confusion. *Checkpoint Systems, Inc. v. Checkpoint Software Technologies*, 269 F.3d 270, 291-92 (3d Cir. 2001). Here, confusion occurred soon after adoption of the ABB Mark and immediately upon first prominent use at the 2015 LIGHTFAIR. This factor weighs heavily in favor of confusion.

*v.      Defendants' intent*

"Defendant's intent is significant because evidence of intentional, willful and admitted adoption of a mark closely similar to the existing marks weighs strongly in favor of finding likelihood of confusion." *Buzz Bee Toys, Inc. v. Swimways Corp.*, 20 F. Supp. 3d 483, 508 (D.N.J. 2014). "This inquiry extends beyond asking whether a defendant purposely chose its mark to promote confusion and appropriate the prior user's good will….The adequacy and care with which a defendant investigates and evaluates its proposed mark, and its knowledge of

similar marks or allegations of potential confusion, are highly relevant." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d at 72.

RAB has used the RAB mark in the lighting industry for nearly 70 years and sells its products across the country. (Barna Decl. ¶ 5)  The RAB Color Mark has been used for 30-40 years and the RAB Lighting Color Mark has been used for over a decade. (Barna Decl. ¶¶ 7-8) Murphy and Broyer are very familiar with the lighting industry. Each has not only worked in the lighting industry for decades, the joint headquarters of ABB and CFS lies within New Jersey, where RAB's headquarters is also located. It is reasonable to conclude from these facts alone that the Defendants were aware of RAB and the RAB Marks prior to adopting the ABB Mark. When one considers the similarity of the literal elements of the ABB Mark and RAB Marks and, most damningly, that fact that Defendants chose to use exactly the same colors and exactly the same font in the ABB Mark as the RAB Color Marks, the only reasonable conclusion is that Defendants intended that the ABB Mark closely resemble the RAB Marks. Such intent strongly weighs in favor of confusion.[5]

*vi.*     *Actual confusion*

Evidence of actual confusion is unnecessary to find likelihood of confusion. *Checkpoint,* 269 F.3d at 291-92. "Because evidence of actual confusion can be difficult to obtain, its absence is generally unnoteworthy and is given little probative weight." *Id.* This is particularly true where, as here, the accused infringer only recently began promoting its business. *See id.* at 291-95. However, when it is present, "evidence of actual confusion may be highly probative of the

---

[5] Defendant ABB's willingness to scoff at legal obligations is further evidenced by its initial trademark application, which fraudulently asserted use of ABBLIGHTING in connection with a plethora of goods since 2013. These included not only LED lighting fixtures, but also aquarium lights, Christmas tree lights, and ultra-violet ray lamps, none of which are sold by ABB. (Lindman Decl. ¶ 22, Ex. 21)

likelihood of confusion." *Checkpoint*, 269 F.3d at 291. As discussed above, despite Defendants' very short use of the ABB Mark it has already caused actual confusion. This is strong evidence that confusion is likely.

*vii.        Channels of trade and marketing media*

"The greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion." *Sabinsa Corp. v. Creative Compounds*, 609 Fd. 3d at 188. "A court should consider the trade exhibitions, publications, and other media the parties use in marketing their products." *Id.* Defendants products directly compete with RAB's products and would typically be sold in the same channels of trade, namely through electrical distributors and contractors. The parties both had booths at the 2015 LIGHTFAIR trade show. (Barna Decl. ¶¶ 20 and 25,) Both have appeared in <u>ledsmagazine.com</u>, a popular trade magazine and website in the lighting industry. (Barna Decl. ¶¶ 15 and 20; Dumas Decl. ¶¶ 3-4 )  The similarity in channels of trade and marketing weighs in favor of confusion.

*viii.        Target customers*

Confusion is more likely where the parties' goods or services are sold to similar customers. *See Lapp, Inc.*, 721 F.2d at 464.  As discussed above, the parties sell the same types of lighting products, have advertised at the same trade show, and appeared in the same trade magazine. This factor weighs in favor of confusion.

*ix.        RAB and ABB are offering the same or similar goods*

"The closer the relationship between the products… the greater the likelihood of confusion." *Kos Pharm.,* 369 F.3d at 722, citing *Lapp*, 721 F.2d at 462. As discussed at length above, the parties not only sell the same type of products, LED lighting fixtures, the designs of

22

the products themselves are very similar. This factor weighs heavily in favor of finding likelihood of confusion.

    B.    **RAB will suffer Irreparable Harm Absent an Injunction and the Balance of Harms Favors RAB**

RAB will suffer irreparable harm if the Defendants are not enjoined from using the ABB Mark. *Pappan,* 143 F.3d at 805. Grounds for a finding of irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill. *Pappan,* 143 F.3d at 805.  Citing *Pappan*, this Court has recently noted the unique and inherent irreparable harms that befall a victim of trademark infringement.  *Harbortouch Payments, LLC v. Denali State Bank,* 2015 WL 2381610 at *15 (D.N.J. May 18, 2015).  As a result of RAB's efforts, RAB has developed a nationwide reputation in the lighting industry over the course of nearly 70 years. (Barna Decl. ¶¶ 5 and 17)  Defendants are usurping the fruits of RAB's efforts through their unauthorized use of the ABB Mark. An immediate danger exists that customers will believe there is a connection between RAB and Defendants if Defendants are not stopped at this early stage. (Barna Decl. ¶ 21)  Such a connection was already inferred by one customer after having seen ABB's booth at LIGHTFAIR in May. (Dumas Decl. ¶ 5)

RAB may suffer not only lost sales but reputational loss because customers or potential customers purchase ABB goods believing that they were RAB goods. (Barna Decl. ¶ 21) The extent of the loss to RAB cannot be measured if Defendants continue to market themselves using the ABB Mark. "(T)here may be no effective way to measure the loss of sales or potential growth – to ascertain the people who don't knock on the door or to identify the specific persons who do not return because of the existence of the infringer." *Morningside Group*, 182 F.3d at 141 (internal quotation marks and brackets omitted).  If Defendants provide poor quality goods or service, the loss to RAB will be even greater. Customers and potential customers may

attribute such goods and behavior to RAB, and RAB will lose the trust of customers and potential customers. (Barna Decl. ¶ 21)  Such losses cannot be repaired with money damages.

 In contrast to RAB's injuries, the Defendants stand to lose little if they are enjoined from using the ABB Mark at this time. Unlike RAB, which has been using the RAB mark for nearly 70 years, Defendants only began using the ABB Mark a few months ago. (Lindman Decl., Ex. 17)  Changing the name now will do comparatively little damage. This will not be overly difficult and certainly will not put them out of business. *See Opticians,* 920 F. 2.d at 197. The costs in time and money associated with adopting a new mark are not "injuries ... that could not be remedied by money damages." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d at 728, citing *Pappan*, 143 F.3d at 805-06.

 Here, any harm caused by an injunction to Defendants would be self-inflicted, because they chose to copy the RAB Marks. The Third Circuit has consistently found that when an infringer's harm is "self-inflicted," the balancing of hardships will weigh in favor of the plaintiff. *Id*. at 806; See also *Jiffy Lube*, 968 F.2d at 379, *Opticians*, 920 F.2d at 197. "(A) party can hardly claim to be harmed where it brought any and all difficulties occasioned by the issuance of an injunction upon itself." *Kos Pharm.*, 369 F.3d at 728. "Indeed a different rule would allow a knowing infringer that constructs its business around its infringement to avoid an infringement by claiming it would have a devastating effect on that business, a result we cannot condone." *Id*. "The Defendant cannot complain he will suffer irreparable injury if a preliminary injunction is issued because he misappropriated the Mark and the Name of the Plaintiff Organization with full knowledge of the rights of the Plaintiff." *Jews For Jesus v. Brodsky*, 993 F. Supp. at 312. There is a substantial risk that RAB would be irreparably harmed absent an injunction. In contrast, the harm to Defendants would be small and self-inflicted at that. The balance of harms favors RAB.

24

C.     **An Injunction does not Disserve the Public Interest**

In a trademark case, "public interest" is "most often a synonym for the right of the public not to be deceived or confused." *Id.* (quoting *Opticians,* 920 F.2d at 197). Protection of the public is essentially assumed once likelihood of confusion is found. See *Angel Flight of Georgia, Inc. v. Angel Flight America, Inc.*, 522 F.3d at 1209. Entry of a preliminary injunction now will protect consumers from confusion that is likely occur, and has already occurred, from Defendants' unauthorized use of the ABB Mark. An injunction now, before Defendants have firmly established the ABB Mark, will not disserve the public interest.

D.     **A Modest Bond is Appropriate**

The Court has discretion over the amount of security to require from RAB in its preliminary injunction order. A relatively low bond amount is appropriate here because Defendants have only been using the ABB Mark for approximately four months and therefore the cost of changing their mark would small.

V.     **CONCLUSION**

RAB has established its ownership of the RAB Marks in connection with lighting fixtures and related products and built substantial goodwill in the marks for over sixty-seven years. Defendants' use of the ABB Mark and ABB trade name is likely to cause confusion in violation of the Lanham Act and New Jersey common law. If Defendants are not immediately enjoined, RAB will suffer irreparable harm that far exceeds any harm that the Defendants may suffer from changing the ABB Mark and ABB trade name at this early stage in the ABB's business. A preliminary injunction will also prevent consumer confusion and will not disserve the public interest. RAB respectfully requests that this Court issue a preliminary injunction and order Defendants to immediately cease their infringing use of the ABB Mark.

Respectfully submitted,

Dated: August 28, 2015

*/s/ Anthony J. Laura*
Anthony J. Laura, Esq.
**EPSTEIN BECKER & GREEN, P.C.**
One Gateway Center
Newark, NJ 07102
Telephone: (973) 642-1900
ALaura@ebglaw.com

Constance R. Lindman, *pro hac vice*
Eric E. Lamb, *pro hac vice*
**SMITHAMUNDSEN LLC**
201 N. Illinois St, S Tower, Ste 1400
Indianapolis, IN 46204
Telephone: (317) 464-4100
clindman@salawus.com
elamb@salawus.com

Attorneys for Plaintiff
RAB Lighting Inc.

26